UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| RODNEY S. PERRY, SR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-02753-SEB-TAB |
| | ) | |
| DENNIS REAGLE Warden, | ) | |
| DUANE ALSIP Asst. Warden, | ) | |
| JIM BOLDMAN, | ) | |
| MICHAEL PLFEEGER, | ) | |
| DON WILLIAMS, | ) | |
| | ) | |
| Defendants. | ) | |

## ORDER GRANTING IN PART AND DENYING IN PART
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Rodney Perry is an Indiana Department of Correction ("IDOC") inmate. In this action he alleges that he faced unconstitutional conditions of confinement while incarcerated at Pendleton Correctional Facility ("Pendleton"). Defendants Dennis Reagle, Duane Alsip, Jim Boldman, Michael Pfleeger, and Don Williams have moved for summary judgment. Dkt. [129].[1] For the reasons below, that motion is **GRANTED IN PART AND DENIED IN PART**.

### I.
### Standard of Review

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the Court views the record and draws all reasonable inferences from it in the light most favorable to

---

[1] The clerk is directed to terminate Property Officer D. Davis as a defendant on the docket because the claims against him were severed into a new civil action. *See* dkt. 49 and *Perry v. Davis,* 1:22-cv-692-RLY-KMB (judgment entered April 21, 2023).

the nonmoving party. *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 572–73 (7th Cir. 2021). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Miller v. Gonzalez*, 761 F.3d 822, 827 (7th Cir. 2014). A court only has to consider the materials cited by the parties, *see* Fed. R. Civ. P. 56(c)(3); it need not "scour the record" for evidence that might be relevant. *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 573−74 (7th Cir. 2017) (cleaned up).

A party seeking summary judgment must inform the district court of the basis for its motion and identify the record evidence it contends demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id*. at 325.

Whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

## II.
### Factual Background

Because Defendants have moved for summary judgment under Rule 56(a), the Court views and recites the evidence in the light most favorable to the Plaintiff and draws all reasonable inferences in Plaintiff's favor. *Khungar*, 985 F.3d at 572–73.

Plaintiff formerly was an inmate at Pendleton at the time of the events in this lawsuit, and is now housed at Indiana State Prison. Dkt. 130-1, pp. 9-10. During the relevant time period, Defendant Reagle was Pendleton's Warden, dkt. 144-1, p. 90; Defendant Alsip was Pendleton's

Deputy Warden, *id.* at 100; Defendant Boldman was a Captain with general oversight of the G cell house ("G-house") at Pendleton, *id.* at 111; Defendant Pfleeger was a Lieutenant who also had oversight responsibilities for G-house, *id.* at 130; and Defendant Williams was a Sergeant who worked in G-house, *id.* at 136.

On August 30, 2021, a guard alleged that a sweep of Plaintiff's cell in general population at Pendleton uncovered a 4-inch-long screw that could be used as a weapon. Dkt. 130-1, p. 23. Plaintiff was then immediately taken to G-house, a segregation unit, where he remained until mid-December 2021. *Id.* He was not allowed to take any belongings with him to G-house, except for the t-shirt, shorts, and shower shoes he was wearing. *Id.* Subsequently, on shower days, Plaintiff would receive other used, but cleaned, clothing, although Plaintiff thought he was entitled to receive brand new clothing under IDOC policies. *Id.* at 36-37.

There initially was no mattress in the single-person cell in G-house where Plaintiff was taken, and at first he had to sleep on a bare metal frame. *Id.* at 27. A mattress was brought to him about 32 hours later. *Id.* at 30. Plaintiff told the guard that the mattress looked dirty, and he did not want it in his cell unless it was wiped down with germicide first. *Id.* at 30-31. The guard then did wipe it down with germicide before putting it in Plaintiff's cell. *Id.* Plaintiff also was given used, but cleaned, bedding, although Plaintiff thought he was entitled to receive all-new bedding under IDOC policies. *Id.* at 35.

In his deposition, Plaintiff described the condition of his G-house cell when he arrived as "nasty," "gross," and "filthy. It had urine dried on the floors, on the walls around the toilet. There was dry feces around the toilet, on the rims of the toilet, a lot of trash and debris in it." *Id.* at 28-29. He also said that food waste accumulated on the floor over several weeks. *Id.* at 34. And, he testified that although he asked Defendant Williams to bring him cleaning supplies shortly after he

3

got to the cell, he received no such supplies for at least 60 days after being sent to G-house.[2] *Id.* at 29, 65.

Plaintiff also stated in his deposition that the showers in G-house "were very nasty" and "disgusting." *Id.* at 49. Specifically, he claimed that they smelled like urine, had scum build-up on the walls, had excess soap and hair on the floor, and were rarely cleaned. Plaintiff also characterized Defendant Alsip's statement in an interrogatory that the showers were cleaned "almost every day" as "the biggest lie he ever told." *Id.* at 51.

During Plaintiff's time in G-house, construction renovations were occurring there. *Id.* at 44-45. At first, the floor above Plaintiff's cell was being renovated, then inmates were moved to that floor and the floor below was renovated. *Id.* at 40-41. Plaintiff alleges that the construction noise was very loud and would commence at about 6 to 6:30 a.m. every morning, and that the work also generated a lot of fumes and debris. *Id.* Contrary to assertions by Defendants, Plaintiff claims inmates were not provided with earplugs for the noise, nor were the construction sites separated from the rest of the prison by plastic sheeting. *Id.* Plaintiff had headaches and nosebleeds while he was in G-house, which he attributes to the construction work. *Id.* at 46. The medical staff gave him ibuprofen for his headaches. *Id.* A nurse examined Plaintiff in connection with the nosebleeds and although she appeared "concerned," ultimately, she believed there was nothing that could be done

---

[2] Defendants assert that Plaintiff "has not presented competent evidence to refute that staff offered to spray offenders' cell with germicide on a weekly basis and that he had access to wash cloths or towels to use as cleaning materials." Dkt. 147, p. 11. But Plaintiff's deposition testimony to the contrary is "competent evidence." *See Koger v. Dart*, 950 F.3d 971, 974 (7th Cir. 2020) (noting that a party's "self-serving" sworn statements need not be corroborated to be considered on summary judgment).

Also, Plaintiff mentioned in his deposition that having access to washcloths and towels clearly refers to items for personal hygiene, not cleaning one's cell. And, it is unclear that staff "offered to spray offenders' cell with germicide" as the standard process for cleaning cells. Rather, the evidence indicates that staff would give a sponge to an offender, staff would spray chemical cleaner on the sponge for the offender to use to clean surfaces, and staff would apply more cleaner to the sponge if needed. Dkt. 130-3, pp. 5-6. Plaintiff has unequivocally denied having access to any cleaning supplies for his cell for 60-plus days after arriving in G-house.

about them. *Id.* at 47. Any medical records related to these conditions have not been designated to the Court.

Plaintiff also claims that in October and November 2021, prison staff refused to allow inmates to have hats and coats to use for outdoor recreation, despite it being very cold outside on some days. *Id.* at 38. Plaintiff also saw an officer conceal a bin full of hats and coats when Plaintiff told other inmates about the bin. *Id.* Plaintiff assumed that the officers wanted to discourage inmates from taking outdoor recreation because of the extra work it required of the officers. Officers began providing hats and coats for outdoor recreation in December 2021. *Id.* at 39.

Plaintiff also challenges the COVID-19 protocols at Pendleton during the fall of 2021. He contends that he did not have a mask when sent to G-house, and none were provided to inmates until mid-November.[3] *Id.* at 43, 59. This is contrary to the interrogatory statement by Defendant Reagle that inmates were given new masks about every two weeks, and by other defendants that they were provided at least once a month. Dkt. 144-1, pp. 96, 103. Plaintiff also testified during his deposition that guards often would seize masks from inmates' cells. Dkt. 130-1, p. 57. Plaintiff also asserts that he often saw staff not wearing masks or wearing them improperly, contrary to IDOC policy at the time generally (but not always) requiring mask-wearing by staff. *Id.* at 44; dkt. 144-1, p. 60. Plaintiff also claims inmates were not given adequate soap and hand sanitizer during this time frame. Dkt. 130-1, pp. 54-55. Although the Defendants assert that fresh soap and sanitizer were put into inmates' shower cubbies at least once a week, Plaintiff claims he only regularly received shaving razors in his cubby. *Id.* Defendants have designated no evidence related to IDOC

---

[3] Plaintiff also states that having a mask would have helped alleviate the construction fumes and debris problem.

or Pendleton's COVID policies and procedures during the fall of 2021. Plaintiff has not alleged or designated any evidence to suggest that he contracted COVID while in G-house.

Plaintiff filed several contemporaneous grievances related to these issues. The Pendleton grievance specialist "returned," i.e., did not process, all of them for various reasons, so they were never passed along to Defendants Reagle, Alsip, or Boldman.[4] Dkt. 130-4. Within Plaintiff's designated evidence, he has included a letter dated September 13, 2021, addressed to Defendants Reagle and Alsip, complaining about the sanitation, construction, and COVID issues in G-house, among other issues. Dkt. 144-1, p. 22. Defendant also alleges that he personally raised concerns about his conditions of confinement to Defendant Pfleeger. Dkt. 130-1, p. 73-74. As for Defendant Boldman, he claims that he once spoke to him about confiscation of legal materials and was unhappy about Defendant Boldman not wearing a mask, with Defendant Boldman replying that he did not have to do so because he was a Captain. *Id.* at 74-75.

Plaintiff also points to a memo Defendant Reagle sent to Pendleton staff in October 2020. In it, he addressed staff concerns about whether a certain directive, unrelated to any of the issues Plaintiff raises here, violated IDOC policy, and stated in part, "IDOC is a fluid organization and often we have to have policies that give a lot of lead [sic] way or have to remember that being ordered to break policy does not invalidate an order, only violations of law or immoral orders can be disobeyed." Dkt. 144-1, p. 198.

Plaintiff filed this suit in October 2021.[5] Dkt. 2. After screening, this Court allowed Plaintiff to proceed with Eighth Amendment claims against the Defendants based on the conditions

---

[4] The Defendants have elected not to claim as an affirmative defense that Plaintiff failed to exhaust administrative remedies through the IDOC grievance process.

[5] Plaintiff never filed an amended complaint. Facts relating to events taking place after October 2021 are taken from the designated evidence.

of confinement he experienced in G-house including: (1) his cell being unclean and not being provided cleaning supplies; (2) the showers being unclean; (3) not being provided with adequate clean bedding; (4) not being provided with adequate clothing; (5) not being provided adequate warm clothing to participate in outdoor recreation; (6) not being adequately protected against construction fumes and noise at the prison; and (7) not being adequately protected against COVID exposure. Dkt. 43. The Defendants have now moved for summary judgment on all pending claims. Dkt. 129.

### III.
### Discussion

Defendants are seeking summary judgment on several grounds. First, Defendants Reagle, Alsip, and Boldman contend there is no basis for them to be personally liable for any alleged wrongdoing. Second, all Defendants argue that they are entitled to qualified immunity regarding Plaintiff's construction work and COVID-related claims. Third, all Defendants argue that there is no genuine issue of material fact as to whether they were deliberately indifferent with respect to any of Plaintiff's claims. They seek judgment as a matter of law in their favor.

### A. Conditions of Confinement Generally

Under the Eighth Amendment, "prisoners cannot be confined in inhumane conditions." *Thomas v. Blackard*, 2 F.4th 716, 720 (7th Cir. 2021) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prisons must "provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of inmates.'" *Farmer*, 511 U.S. at 832 (quoting *Hudson v. Palmer*, 468 U.S. 517 (1984)).

A conditions-of-confinement claim includes both an objective and subjective component. *Giles v. Godinez*, 914 F.3d 1040, 1051 (7th Cir. 2019). Under the objective component, a prisoner

must show that the conditions were objectively serious and created "an excessive risk to his health and safety." *Id.* (cleaned up). Under the subjective component, a prisoner must establish that the defendants had a culpable state of mind — that they "were subjectively aware of these conditions and refused to take steps to correct them, showing deliberate indifference." *Thomas*, 2 F.4th at 720. Proving the subjective component is a "high hurdle" that "requires something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020) (internal quotations omitted). Neither "negligence [n]or even gross negligence is enough[.]" *Lee v. Young*, 533 F.3d 505, 509 (7th Cir. 2008).

### B. Personal Liability of Defendants Reagle, Alsip, and Boldman

The first issue the Court addresses is whether Defendants Reagle, Alsip, or Boldman can be held liable in their individual capacities for any of Plaintiff's claims related to his conditions of confinement because of an alleged lack of personal involvement related to those claims.[6]

"'To recover damages under § 1983, a plaintiff must establish that a defendant was personally responsible for the deprivation of a constitutional right.'" *Whitfield v. Spiller*, 76 F.4th 698, 706 (7th Cir. 2023) (quoting *Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995)). For this purpose, each defendant is considered independently. *Id.* A prison official is personally responsible for purposes of § 1983 if conduct by others causing a constitutional deprivation occurs at the official's direction and with the official's knowledge and consent. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). "That is, [the official] must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." *Id.* (cleaned up). "An inmate's correspondence to a prison administrator may thus establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Perez v. Fenoglio*,

---

[6] Plaintiff has sued all Defendants only in their individual, not official, capacities. Defendants Pfleeger and Williams do not argue that they were not personally involved in the conditions of which Plaintiff complains.

792 F.3d 768, 781–82 (7th Cir. 2015). "Indeed, once an official is alerted to an excessive risk to inmate safety or health through a prisoner's correspondence, 'refusal or declination to exercise the authority of his or her office may reflect deliberate disregard.'" *Id.* at 782 (quoting *Vance*, 97 F.3d at 993).

Defendants Reagle, Alsip, and Bolden note that although Plaintiff did file multiple grievances related to his conditions of confinement in the fall of 2021, none of those grievances were processed or passed along to higher-ups, so none of them had actual notice of any of Plaintiff's complaints through those grievances. Be that as it may, Plaintiff has also designated as evidence a letter written to Defendants Reagle and Alsip, dated September 13, 2021, complaining of his conditions of confinement and sent outside of the formal IDOC grievance procedure. Dkt. 144-1, p. 22-23. Defendants seem to imply that this letter was fabricated to satisfy the legal requirement that Warden Reagle and Deputy Warden Alsip knew about Plaintiff's complaints about his conditions of confinement. But Defendants have not attempted to argue that this letter would be inadmissible at trial and thus should not be considered on summary judgment pursuant to Rule 56(c)(2) of the Federal Rules of Civil Procedure. The Court therefore will consider it for summary judgment purposes. And after considering the letter, and in light of other evidence that the conditions of which Plaintiff complained of in the letter continued unabated after it was sent, the Court concludes there is a material issue of fact as to whether Defendants Reagle and Alsip deliberately turned a blind eye to Plaintiff's alleged unconstitutional conditions of confinement. Defendants Reagle and Alsip are not entitled to summary judgment on this basis.

That said, the September 13 letter was not addressed to Defendant Boldman. And there is no evidence Plaintiff directly complained to Defendant Boldman about the conditions of confinement at issue in this case, except for expressing tangential concern about Defendant

Boldman not wearing a mask once when he talked to Plaintiff about his missing legal materials. There is no designated material evidence on which Defendant Boldman could be found to be personally responsible for any of the confinement issues. Defendant Boldman, therefore, is entitled to summary judgment as to all claims.

Before proceeding to the merits of Plaintiff's claims, the Court pauses to address Plaintiff's repeated argument that Defendant Reagle advised Pendleton employees that they were free to disregard inmates' constitutional rights when he told them: "IDOC is a fluid organization and often we have to have policies that give a lot of lead [sic] way or have to remember that being ordered to break policy does not invalidate an order, only violations of law or immoral orders can be disobeyed." Dkt. 144-1, p. 198. The Court will attach no relevance to this statement and notes that Plaintiff is misinterpreting it. Rather than giving guards free rein to ignore inmates' rights, the statement emphasizes that guards should *not* obey any order from a superior that is immoral or would violate an inmate's rights. IDOC policies are not "law" and do not create constitutional rights. "Section 1983 protects against constitutional violations, not violations of departmental regulation and practices." *Est. of Simpson v. Gorbett*, 863 F.3d 740, 746 (7th Cir. 2017) (cleaned up). If Defendant Reagle told Pendleton employees that they must obey orders, even if contrary to an IDOC policy, he was not advising them to violate inmates' constitutional rights—in fact, just the opposite.

### C. Qualified Immunity

"[Q]ualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). "To overcome the defendant's invocation of qualified immunity, [a plaintiff]

must show both (1) that the facts make out a constitutional violation, and (2) that the constitutional right was 'clearly established' at the time of the official's alleged misconduct." *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 713 (7th Cir. 2013). This "clearly established" standard ensures "that officials can 'reasonably . . . anticipate when their conduct may give rise to liability for damages.'" *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (quoting *Anderson v. Creighton,* 483 U.S. 635, 646 (1987)). To be "clearly established," a constitutional right "must have a sufficiently clear foundation in then-existing precedent." *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018). Given this emphasis on notice, clearly established law cannot be framed at a "high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Wesby*, 583 U.S. at 64 (quoting *Anderson*, 483 U.S. at 641).

Although "a case directly on point" is not required, "precedent must have placed the . . . constitutional question beyond debate." *White v. Pauly*, 580 U.S. 73, 79 (2017) (cleaned up). Put slightly differently, a right is clearly established only if "every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). "The Supreme Court's message is unmistakable: Frame the constitutional right in terms granular enough to provide fair notice because qualified immunity 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2017) (quoting *Kisela v. Hughes*, 584 U.S. 100, 104 (2018) (quotation marks omitted)). Qualified immunity thus "balances two important interests— the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officers from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231.

**1. Construction Work**

Defendants first argue that they are entitled to qualified immunity with respect to Plaintiff's claim that the noise and air particulates from the construction project in G-house during the time he was incarcerated there amounted to an unconstitutional condition of confinement. For purposes of summary judgment, the Court accepts Plaintiff's representations that Defendants neither provided ear plugs to inmates to help alleviate noise concerns nor screened off the construction areas with plastic sheeting to help prevent air pollution from spreading, although Defendants claim that both were done. The Court also accepts Plaintiff's representation that he did not have a face mask to use until mid-November 2021.

With respect to construction activities in a prison, it is true that exposing inmates to a high level of construction-related air pollution may amount to deliberate indifference. *See Maus v. Murphy*, 29 Fed. App'x 365, 369 (7th Cir. 2002) (citing *Helling v. McKinney*, 509 U.S. 25, 35 (1993)). However, the Eighth Amendment does not require a prison to provide an environment that is "'completely free from pollution or safety hazards . . . .'" *Id.* (quoting *Carroll v. DeTella*, 255 F.3d 470, 472 (7th Cir. 2001)). Moreover, it has been observed that "[r]emodeling and upkeep of institutions and buildings, in and out of prison, is a fact of life that must be faced by most individuals." *Givens v. Jones*, 900 F.2d 1229, 1234 (8th Cir. 1990).

In *Givens*, the Court held that a prisoner's claim of migraine headaches caused by noise and fumes from ongoing construction work was insufficient to support an Eighth Amendment deliberate indifference claim. *Id.* Even if the renovation work did inflict some pain, the work was "legitimate," it did not deprive the prisoner of nighttime sleep, and there was a lack of evidence that prison officials were acting with malicious intent or reckless disregard for the prisoner's well-being. *Id.* And in *Maus*, the Court held, in reviewing a summary judgment ruling, that a prisoner

could not recover § 1983 damages based on allegations that poor air quality related to construction work had caused his lung to collapse, because he "did not present evidence connecting lung complications to any risks associated with exposure to lead paint, nor did he present evidence addressing the causes of a collapsed lung." *Maus*, 29 Fed. App'x at 369.

As for claims of excessive noise in prisons generally, "incessant" noise may suffice to support an Eighth Amendment conditions-of-confinement claim. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1433 (7th Cir. 1996) (citing *Williams v. Boles*, 841 F.2d 181, 183 (7th Cir. 1988)). But, to succeed on such a claim, an inmate "must show that the risk of injury from the conditions to which he was exposed was 'so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk.'" *Whitney v. Wetzel*, 649 Fed. App'x 123, 127 (3rd Cir. 2016) (quoting *Helling v. McKinney,* 509 U.S. 25, 36 (1993)). "[S]peculative and unsupported assertions" by a prisoner that he or she faced unconstitutionally-excessive levels of noise are insufficient. *Lucien v. Gramley*, 99 F.3d 1142, 1996 WL 590539, at * 2 (7th Cir. 1996).

The Court concludes that Plaintiff has failed to designate sufficient evidence to show that the construction work at Pendleton caused or threatened to cause a constitutionally-recognizable injury to Plaintiff. As for his claim that the construction debris caused headaches and nosebleeds, these are similar to the types of ailments that courts have frequently described as "not serious enough to implicate the Eighth Amendment." *Bates v. Sullivan*, 6 F. App'x 425, 428 (7th Cir. 2001) (breathing problems and headaches). *See also Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir. 1999) (breathing problems, chest pains, dizziness, sinus problems, headaches); *Willis v. Pfister*, No. 18-CV-333, 2024 WL 216672, at *10 (N.D. Ill. Jan. 19, 2024) (migraine headaches).

It is true that in *Board v. Farnham*, 394 F.3d 469, 486–87 (7th Cir. 2005), evidence of nosebleeds and respiratory problems caused by allegedly poor ventilation in a jail was sufficient

to survive summary judgment and proceed with Eighth Amendment deliberate indifference claims against jail officials. But there also was clear evidence in that case that there was black mold and fiberglass in the jail's duct system, and an expert had opined that this was a health hazard that needed to be remediated. *Id.* Here, by contrast, we have only Plaintiff's conclusory statements connecting his headaches and nosebleeds with the construction debris. Even if such conditions might qualify as "serious" in another context, Plaintiff has not designated scientific or medical evidence connecting them with the construction work, nor any evidence that the air quality in G-house in fact was rendered unacceptable by the construction work. *See Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997) (holding defendants were entitled to summary judgment on inmate's claim that poor air quality caused breathing problems where inmate "offered only conclusory allegations, without backing from medical or scientific sources" in support of claim). Also, Plaintiff's medical records from Pendleton during this time frame are not before the Court. "A plaintiff must meet a motion for summary judgment with evidentiary materials that show there is a genuine issue for trial." *Estate of Simpson*, 863 F.3d at 745. Plaintiff has failed to do so.

Regarding the construction noise, again Plaintiff has failed to designate evidence as to its severity, aside from his own conclusory statements. Although he alleged that the construction work often began at 6 or 6:30 in the morning, there is no evidence that any such work ever took place at night, or how many hours per day it took place, or that it disturbed Plaintiff's sleep, aside from possibly forcing him to wake up earlier than he might have wanted. Plaintiff cannot establish that the construction noise was unconstitutionally loud on the basis of such evidence. *See Hoeft v. Kasten*, 393 Fed. App'x 394, 396 (7th Cir. 2010) (holding inmate's "bare-bones affidavit" that noise was "excessively loud and almost constant" was insufficient to survive summary judgment and

"would not allow a jury to conclude that he was denied the minimal civilized measure of life's necessities") (cleaned up).

For these reasons, Plaintiff has failed to meet step one of defeating Defendants' qualified immunity defense as to the construction work: he has not shown a constitutional violation because of it. He also would fail step two, whether Defendants violated any "clearly established right." For qualified immunity purposes, the baseline rule is that renovation or construction work in a prison is a mere annoyance and prisoners can be subjected to accompanying noise and debris associated with such work, unless the noise and debris rises to such a level that either the air quality or noise risks serious harm to the inmates. The Court is unaware of, and Plaintiff has not cited, any cases holding that prison officials must provide ear plugs or masks to inmates who are in proximity to construction work or that the construction site must be blocked off with plastic sheeting. Rather, what accommodations must be made to account for construction in a prison is a fact-specific determination that requires a balancing of multiple factors.

Chief among those factors is the risk presented to inmates' health and safety by the construction work. "The Eighth Amendment demands that officials ensure 'reasonable safety,' not that they protect against all risks." *Estate of Simpson*, 863 F.3d at 746. Plaintiff cannot show that Defendants violated any "clearly established right" with regard to how they ensured inmates' safety during the construction work in G-house.

### 2. COVID Precautions

Defendants also argue they are entitled to qualified immunity regarding Plaintiff's claim that Pendleton had inadequate COVID precautions in place during the time he was in G-house, or that Defendants ignored or violated what precautions should have been in place. Although COVID was a new infectious disease in 2020, it was less so by late summer 2021. It is clearly established

that prison officials may not "be deliberately indifferent to the exposure of inmates to a serious, communicable disease" under the Eighth Amendment. *Helling v. McKinney*, 509 U.S. 25, 33 (1993). The duty to protect inmates from needless exposure to infectious disease "need not be litigated and then established disease by disease[.]" *Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017).

Unlike many COVID-in-prison or jail cases that have been litigated over the past several years, there is virtually no evidence in the record in this case as to what Pendleton was doing at the time to ameliorate the spread of COVID, whether such policies comported with the most up-to-date public health guidelines, whether Pendleton was even complying with its own policies, and so forth. *Cf. Wilson v. Williams*, 961 F.3d 829, 841 (6th Cir. 2020) (protective measures included screening, quarantining sick inmates, limiting group gatherings, screening inmates and staff, enhanced cleaning measures, and providing masks to inmates); *Valentine v. Collier*, 956 F.3d 797, 802 (5th Cir. 2020) (listing similar measures); and *Swain v. Junior*, 958 F.3d 1081, 1090 (11th Cir. 2020) (listing similar measures). Notably, in *Griffin v. Knight*, 1:21-cv-00038-TWP-TAB, 2023 WL 1363317 at * 3 (S.D. Ind. Jan. 31, 2023), summary judgment was denied because there was a material question of fact on whether defendants were deliberately indifferent to the risk of COVID inmates faced where defendants only relied on plaintiff's complaint, designated no evidence of their own, and "failed to describe any other affirmative steps they took to protect inmates from contracting COVID-19".

Here, similar to *Griffin*, the Defendants provide little evidence of what COVID policies and procedures were in place at Pendleton from August to December 2021. To the extent there was a Pendleton policy of providing new masks to inmates at least monthly, Plaintiff denies that this policy was complied with until at least mid-November 2021. There also is some evidence of IDOC

16

masking requirements for staff, but Plaintiff asserts this was regularly disregarded. There is no evidence of testing or screening requirements for inmates or guards, no evidence of vaccinations (which were available by that time), and no evidence of quarantining of sick inmates, for example. The Court declines to find that by late summer of 2021, it would have been objectively reasonable to essentially do nothing to address COVID in prisons. On the other hand, this Court held in *Griffin* that the defendants nonetheless were entitled to qualified immunity with respect to their response, or lack thereof, to COVID. *Id.* at \*4.

Moreover, there was evidence in *Griffin* that the plaintiff may in fact have contracted COVID. *Id.* at \*2. The Court concludes that in this case, there is a lack of evidence on the subjective component of Plaintiff's COVID precaution claims. That is, nothing in the record suggests that either (1) the COVID infection rate in Pendleton G-house was abnormally high in the late summer and fall of 2021, as compared to either the rest of Pendleton, or prisons generally (where social distancing is difficult), or even to the population of Indiana or the United States at large during that period; or (2) that Plaintiff himself ever contracted COVID. In other words, even if objectively speaking Pendleton officials could have been doing more with respect to COVID precautions, subjectively speaking there is nothing to indicate that Pendleton officials were deliberately indifferent to prisoners' or Plaintiff's health because of, for example, an abnormally-high COVID infection rate or because Plaintiff himself contracted it.

It is not clear that an inmate must actually contract COVID to state a conditions-of-confinement claim based on a prison's failure to institute adequate COVID precautions. But, even if "actual injury isn't a prerequisite for an Eighth Amendment claim, the absence of any cognizable harm certainly suggests an absence of deliberate indifference." *Chapa v. Kenton Cnty. Judge Exec.*, No. CV 21-22-DLB-MAS, 2023 WL 4553602, at \*8 (E.D. Ky. July 14, 2023), *appeal dismissed*.

*See also Dykes-Bey v. Washington*, 2021 WL 7540173 at *3 (6th Cir. Oct. 14, 2021) (upholding PLRA dismissal, for lack of sufficient allegation of subjective prong on deliberate indifference claim, where the complaint did not "allege that the defendants knowingly housed COVID-19 positive inmates alongside any plaintiff, or even that a COVID-19 outbreak occurred"); *Pugh v. Contra Costa Cnty.*, No. 22-CV-01487-JSW, 2023 WL 8481808 at *3 (N.D. Cal. Dec. 7, 2023) (noting there was a triable issue of fact of whether plaintiff-inmate was injured by defendants' alleged deliberate indifference regarding COVID precautions, where defendants argued plaintiff never tested positive but plaintiff claimed he developed COVID symptoms).

The Court concludes Defendants are entitled to summary judgment with respect to Plaintiff's COVID claims, based on an absence of evidence suggesting that Defendants were subjectively deliberately indifferent to Plaintiff's health. Thus, there is no need to assess whether Defendants are entitled to qualified immunity because Plaintiff has not shown the existence of a constitutional violation.

### D. Other Claims

### 1. Lack of Mattress/Bedding

The Court now turns to Plaintiff's claims for which the Defendants do not argue qualified immunity. The first such claim is that he was subject to an unconstitutional deprivation when (according to his deposition testimony) he did not receive a mattress in his G-house cell for approximately 32 hours after being moved to it, and having to sleep on the bare metal frame in the meantime. He also complains about not receiving a brand-new mattress and bedding when it did arrive, contending IDOC policy required them to be new. And, he contends that the bedding he did receive did not get laundered for weeks at a time.

As a matter of law, Plaintiff's claims regarding his mattress and bedding do not amount to an Eighth Amendment violation. The Constitution "'does not mandate comfortable prisons' . . . ." *Farmer*, 511 U.S. at 832 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981)). Rather, all that is required is "reasonably adequate ventilation, sanitation, bedding, hygienic materials, and utilities." *Thomas*, 2 F.4th at 720 (cleaned up). Thirty-two hours without a mattress is not unreasonable. *Stephens v. Cottey*, 145 Fed. App'x 179, 181 (7th Cir. 2005) (no Eighth Amendment violation where plaintiff alleged being denied a mattress for three days). As for not getting a new mattress and bedding, even if IDOC policy supposedly required it, the violation of an institutional policy does not amount to an Eighth Amendment violation. *See Estate of Simpson*, 863 F.3d at 746. The mattress was cleaned with germicide upon delivery at Plaintiff's request. Even if the mattress was not as clean as Plaintiff would have liked, and even if he would have preferred that the bedding be cleaned more regularly, he has failed to designate evidence that either the mattress or bedding was unsanitary and unacceptable for human use. Defendants are entitled to summary judgment with respect to Plaintiff's mattress and bedding claims.

### 2. Lack of Indoor Clothing

Next, Plaintiff contends he was not supplied with adequate clothing after his move to G-house. Again, part of his claim is that IDOC policy required him to be provided with brand new clothing; again, that argument fails to establish an Eighth Amendment violation. *See id.* A lack of adequate clothing for a prisoner can, of course, violate the Eighth Amendment. *See Gillis v. Litscher*, 458 F.3d 488, 493 (7th Cir. 2006). Plaintiff acknowledged in his deposition that he did in fact always have clothing, except when showering. He kept the clothing he had on when moved to G-house and received clean (but used) clothing on each shower day. He has presented no evidence

that he lacked adequate clothing for the temperature and conditions inside G-house. Defendants are entitled to summary judgment with respect to Plaintiff's indoor clothing claims.

### 3. Lack of Coats and Hats for Outdoor Recreation

Separate from the indoor clothing issue, Plaintiff contends he and other inmates were deliberately deprived of coats and hats to use for outdoor recreation during October and November 2021, and alleges that some days in those months were simply too cold to go outside without such items. Even so, Plaintiff does not allege that he or any other inmate was forced to be outside in the cold "for long periods of time or that he suffered anything more than the usual discomforts of winter." *Mays v. Springborn*, 575 F.3d 643, 648 (7th Cir. 2009) (rejecting Eighth Amendment claim based on alleged failure to provide warm clothing during winter).

If Plaintiff is suggesting that Pendleton staff wanted to discourage inmates from taking outdoor recreation, he has not argued or alleged that inmates were deprived of all recreation altogether, or specified precisely how many times in October and November it was impossible to enjoy outdoor recreation without coats and hats. This is insufficient to proceed on an Eighth Amendment claim. *See Vasquez v. Braemer*, 586 Fed. App'x 224, 228 (7th Cir. 2014) (four hours per week of outdoor recreation did not violate Eighth Amendment); *Harris v. Fleming*, 839 F.2d 1232, 1236 (7th Cir. 1988) (indoor recreation only did not violate Eighth Amendment); *Bailey v. Shillinger*, 828 F.2d 651, 653 (10th Cir. 1987) (one hour per week of outdoor recreation did not violate Eighth Amendment). Defendants are entitled to summary judgment with respect to Plaintiff's outdoor clothing claims.

### 4. Unclean Cell and Showers

The Court now addresses together Plaintiff's claims that Defendants were deliberately indifferent to unsanitary conditions in his cell and in the G-house showers. It is true that inmates

cannot expect the cleanliness of a prison to match that of a "good hotel." *See Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988). On the other hand, prisoners are entitled to at least minimally-sanitary living conditions. *See Johnson v. Pelker*, 891 F.2d 136, 139 (7th Cir. 1989). The cleanliness (or lack thereof) of a prison's living quarters may be actionable if the conditions are "unusually dirty or unhealthy . . . ." *Lunsford v. Bennett*, 17 F.3d 1574, 1580 (7th Cir. 1994). When considering a claim such as Plaintiff's, the degree of alleged filth must be balanced against the time the inmate was forced to endure it. *See McBride v. Deer*, 240 F.3d 1287, 1291–92 (10th Cir. 2001). "Not surprisingly, human waste has been considered particularly offensive so that courts have been especially cautious about condoning conditions that include an inmate's proximity to it." *Id.* (cleaned up).

In his deposition, Plaintiff described the condition of his G-house cell when he arrived as "nasty," "gross," and "filthy. It had urine dried on the floors, on the walls around the toilet. There was dry feces around the toilet, on the rims of the toilet, a lot of trash and debris in it." Dkt. 130-1, p. 28-29. He also said that food waste was allowed to accumulate on the floor over several weeks. And he testified that although he asked Defendant Williams to bring him cleaning supplies shortly after he got to the cell, he received no such supplies for at least 60 days after being sent to G-house.

Plaintiff also stated in his deposition that the showers in G-house "were very nasty" and "disgusting." *Id.* at 49. Specifically, he claimed that they smelled like urine, had scum build-up on the walls, had excess soap and hair on the floor, and were rarely cleaned. Plaintiff also characterized Defendant Alsip's statement in an interrogatory that the showers were cleaned "almost every day" as "the biggest lie he ever told." *Id.* at 51.

The Court concludes that these facts as described by Plaintiff are enough to allow his claims related to the cleanliness of his cell and the showers to survive summary judgment. They raise genuine issues of material fact as to whether the Defendants were deliberately indifferent to constitutionally inadequate sanitation. In *McBride*, the Court found sufficient allegations of unsanitary prison conditions where a prisoner was left in a feces-covered cell for three days before it was cleaned. 240 F.3d at 1291. It is not clear that Plaintiff's cell is claimed to be *as* dirty as in *McBride*, though it comes close. And, Plaintiff has alleged a significant presence of the previous occupant's urine and feces in his cell and that he was forced to endure it for much longer than the inmate in *McBride*.

Plaintiff's allegations as to the showers present a slightly closer call, as the conditions are not as heinous as what has been alleged as to Plaintiff's cell, and he was not forced to be in them nearly constantly. Still, the Court concludes there is a question of fact on this issue, particularly given Plaintiff's allegation as to how infrequently the showers were cleaned, directly contrary to Deputy Warden Alsip's description. The Court also deems it crucial that given the allegations of how filthy Plaintiff's cell was, it would have been especially important to have a sanitary shower area to use. *See Coleman v. Dart*, No. 17-C-2460, 2019 WL 670248 at ** 3, 9 (N.D. Ill. Feb. 19, 2019) (denying summary judgment on Eighth Amendment claims where jail inmate alleged that shower was "very nasty, dirty, and unclean," that it had not been "power washed at all," and that "[t]here is large amounts of dirt[] that comes off of inmates bod[ie]s that is everywhere . . . ."

## IV. Conclusion

The Defendants' motion for summary judgment, dkt. [129], is **granted in part and denied in part**. No evidence supports any claim against Defendant Boldman going forward, and all claims

against him are dismissed. The **clerk is directed** to terminate Defendant Boldman as a defendant on the docket.

As to Defendants Reagle, Alsip, Pfleeger, and Williams, summary judgment is granted as to all claims except those relating to the cleanliness of Plaintiff's cell and the showers in Pendleton's G-house during the time Plaintiff was housed there. The cleanliness claims will be resolved by a settlement or trial.

The Court now sua sponte reconsiders Plaintiff's motion for counsel, dkt. 83, and will attempt to recruit counsel to represent Plaintiff through final judgment. However, **the clerk is directed** to send Plaintiff a form motion for assistance with recruiting counsel. Because this form contains the terms of accepting counsel, Plaintiff must complete the form and return it no later than **April 1, 2024,** if he seeks the Court's assistance. Plaintiff's failure to timely complete and return the form will be construed as abandonment of his request for counsel. The Magistrate Judge is requested to set the matter for a telephonic status conference once recruited counsel has appeared or if Plaintiff abandons his request for counsel.

**IT IS SO ORDERED.**


Date:

_____3/5/2024_____

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All ECF-registered counsel of record via email

RODNEY S. PERRY, SR.
974441
INDIANA STATE PRISON
INDIANA STATE PRISON
Electronic Service Participant – Court Only


Magistrate Judge Baker's Chambers